Filed 1/27/22  P. v. Phillips CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>KEVIN PHILLIPS,<br><br>   Defendant and Appellant. | 2d Crim. No. B308806<br>(Super. Ct. No. TA130215)<br>(Los Angeles County) |

Kevin Phillips appeals from a postjudgment order denying his petition for resentencing under Penal Code[1] section 1170.95. Phillips contends the trial court erred in summarily denying his petition without appointing counsel.  We agree that the court so erred (*People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*)), but conclude the error was harmless because the record of Phillips's conviction demonstrates he is ineligible for relief under section 1170.95 as a matter of law.  Accordingly, we affirm.

---

[1] All unlabeled statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL HISTORY[2]
### *The Shootings of Vital*

In 2013, Phillips, Martin L. Vital, and Christopher Ladd were members of the Grape Street Crips criminal street gang, whose territory includes the area in and around the Jordan Downs housing complex on 101st Street in Watts. On August 4, Vital was shot in the arm as he was arriving at his residence. When questioned by the police, Vital was uncooperative and declined to offer any information regarding the identity of the shooter or shooters.

On September 23, Ladd's mother rented a Hyundai Accent and "loaned" it to Ladd, who returned it to her at about 8:00 p.m. that night. At about 2:30 p.m. that same day, Vital was sitting outside his girlfriend's apartment in Jordan Downs when a car drove up and one or more of its occupants fired several gunshots at Vital, causing a grazing wound to his head. Vital subsequently said "'I'm gonna go get those niggas.'" That same day, Phillips left his house in his girlfriend's blue Chrysler minivan.

### *The Shooting of Kevin White*

Kevin White was a member of the Bounty Hunter Bloods gang, a Grape Street Crips rival, whose territory includes the area in and around the Nickerson Gardens housing complex on 114th Street in Watts. On September 23 at about 7:25 p.m., White was in the front yard of his residence at Nickerson Gardens when a Chevrolet Tahoe pulled up. White briefly

---

[2] The facts are derived from our 2018 opinion affirming the judgment against Phillips with modifications. (*People v. Phillips* (June 20, 2018, B272498) [nonpub. opn.].) We grant the People's unopposed request for judicial notice of the record in the prior appeal. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

approached the Tahoe, then turned and ran back into his yard. Two men got out of the Tahoe and repeatedly shot White, killing him.  Ashley Green witnessed the shooting and was shot in the leg after she called out to White.  Latrice Antwine, who was at White's residence when the shootings occurred, saw a grayish blue minivan stopped in the street with the passenger side doors opened.  Someone got in the minivan and it sped away with the passenger door still open.

### The Shooting of Markice Brider

Markice Brider was a member of the rival P.J. Watts Crips gang, whose territory includes the area in and around the Imperial Courts housing complex on 114th Street in Watts.  On the evening of September 23, Brider was visiting his girlfriend Latrisian McMeans at her apartment in Imperial Courts.  At about 7:35 p.m., Brider walked out of McMeans's apartment and several gunshots rang out.  McMeans looked outside and saw three men getting into a blue Chrysler minivan.  Before the minivan drove off McMeans heard one of the men say, "Fuck you, nigga" and "[t]his is Grape," which she interpreted as a reference to the Grape Street gang.

McMeans ran outside and found Brider, who had been shot six times.  A gunshot wound to his head was fatal.  The four bullets recovered from his body and four casings recovered from the scene of the shooting were fired by a 9-milimeter handgun, and four additional casings recovered from the scene were fired by a .45-caliber handgun.

### The Stop and Search of the Minivan and Phillips's Arrest

At about 8:50 p.m. that night, Los Angeles Police Officer Roberto Yanez was on patrol near Jordan Downs when he saw a blue Chrysler minivan pulling away from a curb with the rear

passenger sliding door open.  Officer Yanez activated his lights and conducted a traffic stop of the minivan.

Phillips was driving the minivan and fellow Grape Street Crips members Donte Welch and Thomas Bramlett-Payton were in the front and rear passenger seats, respectively.  After additional officers arrived, Phillips was ordered out of the minivan and asked for his driver's license.  Phillips responded that his identification was inside the minivan on or near the driver's seat.  While looking inside the minivan for Phillips's identification, an officer saw a handgun in plain view under the driver's seat.

Phillips, Welch, and Bramlett-Payton were arrested and Phillips's cellphone was seized from his person.  A loaded .40-caliber handgun and a loaded .45-caliber handgun were found under the minivan driver's seat.  Vital's cellphone was found behind the front passenger seat.  It was subsequently determined that the .45-caliber handgun matched the expended .45-caliber casings recovered from the scenes of the White and Brider shootings.  McMeans identified the minivan as the one she had seen when Brider was shot, and Antwine said it was similar to the one involved in White's shooting.

### Video Surveillance Camera Evidence

Jordan Downs, Nickerson Gardens, and Imperial Courts all have police-monitored video surveillance and license plate recognition cameras.  Recordings from these cameras on the day of the shootings were played at trial.  At about 4:40 p.m. on September 23, the cameras at Jordan Downs recorded images of a blue minivan pulling into the parking lot, followed shortly thereafter by the rented Hyundai.  Ladd is then shown exiting the Hyundai and walking to the occupants of the minivan, which

4

included Phillips and an unidentified individual. Ladd then walked away in one direction while Phillips and the unidentified individual walked toward Vital's apartment. At 4:46 p.m., Ladd returned to the Hyundai with an unknown male and drove away.

At 5:07 p.m., Phillips returned to the parking lot with Welch and Bramlett-Payton. About 20 minutes later, an unknown individual approached Phillips and handed him a white object. At about 6:27 p.m., Phillips drove away in the minivan along with two other men. Between 7:14 p.m. and 7:16 p.m., the minivan and Hyundai were seen travelling together in Nickerson Gardens. Shortly thereafter, the vehicles could be seen driving at a high rate of speed on Compton Avenue in Nickerson Gardens.

At 7:35 p.m., the minivan and Hyundai were seen travelling together east on 114th Street in Imperial Courts. The minivan stopped in front of Brider's residence and the Hyundai drove around the minivan. One of the men in the minivan got out with a gun in his left hand and shot Brider. Two other men got out of the minivan and also fired at Brider as he was lying on the ground. All three men got back into the minivan and drove off. The Hyundai made a u-turn and followed the minivan.

### Additional Evidence

Cellular telephone records indicated that Vital and Ladd's cellphones had also utilized cellular towers in the vicinity of Brider's murder around the time he was shot. A photograph found on Vital's cellphone (which was recovered from the minivan) depicted a .45-caliber handgun that resembled one of the guns found in the minivan. Vital's fingerprints were also found on the window of the minivan's rear passenger sliding door. In May 2015, while executing a search warrant at a Grape Street

5

Crips hangout, officers found the 9-millimeter handgun used in the shootings of White and Brider.

### *Gang Expert Testimony*

Los Angeles Police Officer Francis Coughlin testified as the prosecution's gang expert. The Grape Street Crips' primary activities include murder, robbery, illegal firearm possession, and narcotic sales. When the shootings occurred, appellants were all documented members of the gang. For the past 20 years, the Grape Street Crips have been at war with the P.J. Watts Crips and the Bounty Hunter Bloods. The latter two gangs were united against the Grape Street Crips. When presented with a hypothetical tracking the facts of the case, Officer Coughlin opined that the shootings were committed for the benefit of the Grape Street Crips because they were in retaliation for an attack on one of its members. When a gang commits an act of violence against a rival gang member, that member's gang typically retaliates with a greater degree of violence.

### *The Judgment and Petition for Resentencing*

In 2014, a jury convicted Phillips, Vital, and Ladd of the first degree murder of Brider (§§ 187, subd. (a), 189) and found true the special circumstance allegation that the murder was intentionally committed for the benefit of a criminal street gang (§ 190.2, subd. (a)(22)).[3] The jury also found true allegations that a principal discharged a firearm causing death and that the murder was committed for the benefit of a criminal street gang (§§ 186.22, subd. (b)(1)(A), 12022.53, subds. (b)-(e)). Phillips was sentenced to life without the possibility of parole plus 25 years to

---

[3] Appellants were acquitted on charges of first-degree special circumstances murder of White and the attempted murder of Green.

6

life.  The judgment against him was subsequently affirmed on appeal.  (*People v. Phillips*, *supra*, B272948.)

In September 2020, Phillips filed a petition for resentencing under section 1170.95 and requested the appointment of counsel. The petition alleged among other things that Phillips was convicted of first degree murder "pursuant to the felony murder rule or the natural and probable consequences doctrine" and that he "could not now be convicted" of that crime because he was not the actual killer and "did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree."

The trial court summarily denied the petition without appointing counsel and prior to the filing of the People's opposition.  The court reasoned that the jury had not been instructed on felony murder and had only been instructed on the natural and probable consequences theory as to the acquitted charge of attempted murder, and that "the only theory available to reach first degree [murder] was willful, deliberate, and premeditated murder."  The court also noted that in finding the gang special circumstance allegation true, "the jury had to have found that [Phillips] acted with the intent to kill."

## DISCUSSION

Phillips contends the trial court's denial of his petition for resentencing without appointing counsel violated his rights to the assistance of counsel and due process under section 1170.95 and the federal and state constitutions.  We conclude the court erred in failing to appoint counsel, but deem the error harmless.

In 2018, the Legislature amended the felony murder and the natural and probable consequences doctrines to ensure that "murder liability is not imposed on a person who is not the actual

7

killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f) p. 6678; *People v. Gentile* (2020) 10 Cal.5th 830, 842.) The Legislature then amended sections 188 and 189, and added section 1170.95, to provide a procedure to persons previously convicted of murder pursuant to the felony murder or natural and probable consequences theories to obtain retroactive relief. (*Gentile*, at p. 853 ["the Legislature intended section 1170.95 to be the exclusive avenue for retroactive relief under Senate Bill [No.] 1437"].) To be eligible for resentencing, a defendant must establish that he "could not presently be convicted of murder because of changes to Section 188 or 189 made effective" as part of Senate Bill No. 1437. (§ 1170.95, subd. (a)(3).)

Subdivision (a) of section 1170.95 sets forth the requirements for a facially sufficient petition. The petitioner must state that the charging document allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; the petitioner was convicted of murder; and the petitioner could not be convicted of murder because of changes to Section 188 or 189, as effective on January 1, 2019. Subdivision (b)(1)(A) of section 1170.95 states where and how the petition is filed and specifies its required content, including a declaration by petitioner that he or she "is eligible for relief under this section, based on all the requirements of subdivision (a)."

If the petition meets the requirements of section 1170.95, subdivisions (a) and (b), the trial court proceeds to subdivision (c) to assess whether a prima facie showing for relief has been made. In *Lewis*, *supra*, 11 Cal.5th 952, our Supreme Court held that if a

8

defendant files a facially sufficient petition and requests the appointment of counsel, the court must appoint counsel and entertain further briefing. (*Id.* at p. 957.) Only after the appointment of counsel and the opportunity for briefing may the court consider the record of conviction to determine whether petitioner made a prima facie showing that he or she is entitled to relief. (*Id.* at pp. 969-970.)

The record of conviction relates to the trial court's inquiry, distinguishing petitions with potential merit from those clearly meritless. (*Lewis*, *supra*, 11 Cal.5th at p. 971.) In making its preliminary assessment regarding petitioner's allegations, the court does not engage in fact finding and must take petitioner's allegations as true. (*Ibid.*) However, if the record of conviction, including the court's documents, refute the allegations in the petition, the court may make a credibility determination adverse to petitioner. (*Ibid.*)

Here, Phillips's petition for resentencing met the requirements for facial sufficiency and he requested the appointment of counsel. The trial court thus erred in summarily denying his petition without first appointing counsel and accepting briefing. (*Lewis*, *supra*, 11 Cal.5th at pp. 969-970.) The court in *Lewis* nevertheless concluded that deprivation of a petitioner's right to counsel in this context is state law error only, tested for prejudice under the standard established in *People v. Watson* (1956) 46 Cal.2d 818. Moreover, any error in summarily denying a section 1170.95 petition is harmless unless the petitioner can show ""it is reasonably probable that if [he or she] had been afforded assistance of counsel his [or her] petition would not have been summarily denied without an evidentiary hearing."" (*Lewis*, at p. 974.)

We conclude that the trial court's error in failing to appoint counsel and provide an opportunity for briefing before considering the record of conviction and summarily denying the petition is harmless. Contrary to Phillips's claim, the record of conviction unequivocally establishes that he was convicted of murder on the theory that he acted with an intent to kill. As the trial court noted, the only theory upon which the jury was instructed with regard to the murder charge was willful, deliberate, and premeditated murder. The court also noted that in finding the gang special circumstance allegation true, the jury necessarily found that Phillips acted with the intent to kill. Accordingly, the error in failing to appoint counsel on Phillips' petition for resentencing was harmless. (*Lewis*, *supra*, 11 Cal.5th at p. 974.)

## DISPOSITION

The order denying Phillips' section 1170.95 petition is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.

We concur


YEGAN, Acting P. J.


TANGEMAN, J.

10

Ricardo R. Ocampo, Judge
Superior Court County of Los Angeles

_____

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee, and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.